United States District Court
Eastern District of New York

-----------------------------------X

Cement and Concrete Workers
District Council Welfare Fund, *et
al.*,

                    Plaintiffs,

     - against -

Superior Gunite,

                    Defendant.

-----------------------------------X

**Memorandum and Order**

No. 22-cv-1014 (KAM) (TAM)

**Kiyo A. Matsumoto, United States District Judge:**

     The plaintiffs brought this action against Superior Gunite
("Superior") under the Employee Retirement and Income Security
Act ("ERISA") and the Labor Management Relations Act ("LMRA") to
recover fringe benefit contributions and dues checkoffs that
they allege Superior failed to pay in accordance with its
contractual obligations.  The plaintiffs now move for summary
judgment.  For the reasons below, the Court grants the motion in
part and denies it in part without prejudice.

**Background[1]**

     The plaintiffs are the Cement and Concrete Workers District
Council (the "Council"),[2] a labor organization affiliated with

---

[1] Unless otherwise stated, these facts are undisputed and taken from the
statements the parties submitted in accordance with Local Civil Rule 56.1.
[2] The Council's constituent unions are Locals 6A, 18A, and 20.  (ECF No. 39,
Angelone Decl., ¶ 5.)

the Laborers International Union of North America ("LIUNA");
five employee benefit plans that provide health insurance,
retirement savings, and training benefits to employees of
contractors who sign collective bargaining agreements with the
Council (the "Funds");[3] and the Funds' administrator, Margaret
Bowen.  (ECF No. 37-1 pp. 1-7, Def.'s Resp. Pl.'s Am. Rule 56.1
Statement ("Def.'s Counter-56.1"), ¶¶ 1-6.)  These benefits are
funded by contributions that contractors pay into the Funds
under the Council's collective bargaining agreements, which
require a contractor to contribute for each hour of "covered
work" (as defined in the applicable agreement) performed by one
of its employees.  (*Id.* ¶¶ 7-8.)

Superior is a contractor that performs specialized cement
work known as "shotcrete" or "gunite," which involves
pressurizing a cement mix and spraying it into place on a
lattice of rebar that holds the mix in place while it sets.
(*Id.* ¶¶ 9-10.)  Superior also performs ancillary tasks such as
cleaning up cement mix that does not stick to the lattice.  (*Id.*
¶ 11.)  Superior performs this work throughout the country,
including in New York City.  (*Id.* ¶ 11.)

LIUNA and Superior are parties to a collective bargaining
agreement (the National Specialty Agreement or "NSA"), which the

---

[3] The five specific plans are the Cement and Concrete Workers District Council
Welfare Fund, Pension Fund, Annuity Fund, Training and Apprenticeship Fund,
and Scholarship Fund.  (*See* ECF No. 15, Am. Compl., p. 1.)

parties agree was in effect from July 1, 2018, through December 31, 2020. (*Id.* ¶¶ 12–16.) Under the NSA, Superior agreed to hire employees through the local LIUNA affiliate union with territorial jurisdiction over the work. (*Id.* ¶ 17.) Superior further agreed to deduct union initiation fees, dues, or agency shop fees from those employees' wages and remit them to the local union. (*Id.* ¶ 18.) Finally, Superior agreed to submit a job notification form to LIUNA and hold a pre-job conference with the local union before starting a job in the local union's jurisdiction. (*Id.* ¶ 21.)[4]

The NSA provided that wages and benefits would be determined through collective bargaining between the local union and contractor where a particular job was located. (*Id.* ¶ 19.) Accordingly, Superior and the Council executed several collective bargaining agreements (the "CBAs"), which the parties agree were in effect from July 1, 2018, through December 31, 2020. (*Id.* ¶¶ 24–26.) The CBAs required Superior to contribute

---

[4] Superior "denies" this fact, stating that Superior is "already bound to Local Union jurisdiction when it signs a sub-contract with the Prime and General Contractor." (Def.'s Counter-56.1 ¶ 21.) This "denial" is a legal argument about how the contract should be interpreted, not a genuine factual dispute about what the contract says. Several other of Superior's "denials" also are legal arguments that do not raise genuine factual disputes. (*See id.* ¶¶ 22–23, 27–29.) "Accordingly, to the extent [the plaintiffs'] relevant statements are supported by the record, and [Superior] contests them solely with legal conclusions, such statements are deemed undisputed." *See Cotnoir-Debenedetto v. Uniondale Union Free Sch. Dist.*, No. 20-cv-5096 (NGG), 2023 WL 4274701, at *5 (E.D.N.Y. June 29, 2023); *see also* Fed. R. Civ. P. 56(e)(2) (explaining that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion").

3

to the Funds for each hour of "covered work" performed by one of its employees, defined to include "[c]ement mortar applied under pressure by a 'Cement Gun' or any other pressure machine, such as 'Guniting'" as well as the "cleaning of all types of cement and concrete debris" in "the five . . . counties of New York City." (*Id.* ¶¶ 27, 32-35.)  The CBAs also required Superior to remit dues and other payments (collectively "dues checkoffs") weekly from the wages of employees who performed covered work and to accompany each payment with a remittance report. (*Id.* ¶¶ 28-29.)  The CBAs authorized the Funds to inspect and audit Superior's books and records to confirm payment and required Superior to maintain payroll and related records for at least six years to allow for a proper audit. (*Id.* ¶ 30.)

The NSA also required Superior to "become party to the standard fringe benefit trust agreements" between the local contractor and local union. (*Id.* ¶ 20.)  Like CBAs, the Funds' trust agreements also required contractors to make contributions for each hour of covered work. (*Id.* ¶ 36.)  The Funds' trust agreements also authorized the Funds' trustees to implement policies, which were deemed incorporated into the trust agreement and binding on the parties. (*Id.* ¶ 37.)  Relevant here, the Funds' trustees adopted a "Delinquency Collection and Audit Policy and Procedure" ("Collection Policy"), requiring employers to provide the auditor all records in accordance with

4

the collective bargaining procedure and rendered a delinquent employer liable for delinquent contributions, interest, liquidated damages, fees, and costs consistent with the CBAs. (*Id.* ¶¶ 38-40.)

In 2021, the Funds conducted an audit covering July 1, 2018, through December 31, 2020 (the "audit period"), which revealed that Superior failed to pay fringe benefits or remit dues checkoffs for 10,748.5 hours of covered work performed by its employees during that period. (*Id.* ¶¶ 46-52, 54-55.) The auditor determined that Superior owed $257,210.35 in fringe benefit contributions and $33,158.41 in dues checkoffs for a total delinquency of $290,368.76. (*Id.* ¶¶ 56-57.) On December 8, 2021, the Funds demanded payment. (*Id.* ¶ 58.) Superior never made any payments; however, it paid $546,343.65 to funds benefitting another LIUNA affiliate, Local 731, during the audit period. (*Id.* ¶ 59; ECF No. 37-1 pp. 7-10, Def.'s Am. Statement Facts Pursuant to Rule 56.1 ("Def.'s 56.1"), ¶ 2.) The plaintiffs commenced this action against Superior on February 24, 2022, to recover the delinquent payments. (ECF No. 1, Compl.; *see also* ECF No. 15, Am. Compl. (operative complaint).)

## Legal Standard

Summary judgment is proper when there are no genuine disputes of material fact and the undisputed facts entitle the

moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it might affect the outcome of the case under the governing law.  *Id.*  In resolving a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024).

The party moving for summary judgment has the initial burden to show that there are no genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party would have the burden of proof at trial, the moving party's burden at the summary judgment stage is only to "point out" that there is insufficient evidence to create a genuine dispute of material fact.  *Id.* at 325.  Where the *moving party* would have the burden of proof at trial, however, its burden at the summary judgment stage is to submit evidence conclusively establishing the absence of any genuine disputes of material fact.  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998); *SEC v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396, 411 (S.D.N.Y. 2018).  If the moving party meets that burden, the non-moving party must

6

respond by submitting its own evidence sufficient to create a genuine dispute of material fact in order to avoid summary judgment and proceed to trial. *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023).

## Discussion

Here, the plaintiffs are the parties seeking summary judgment. (*See* ECF No. 35, Notice Mot. Summ. J.)  At trial, they would bear the burden of proof. *See Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 142 (2d Cir. 1993) (noting that the "plaintiff always shoulders the ultimate burden of proof"). Thus, the plaintiffs have the initial burden to establish that there are no genuine disputes of material fact and that the undisputed facts entitle them to judgment as a matter of law.

The governing law comprises the relevant contracts between the parties, Section 515 of ERISA, which requires an employer to contribute to employee benefit plans in accordance with the terms of its collective bargaining agreements, *see* 29 U.S.C. § 1145, and Section 301 of the LMRA, which permits a union to sue an employer in federal court for breach of a collective bargaining agreement, *see* 29 U.S.C. § 185(a).  The LMRA provides for recovery of "non-ERISA" sums such as union dues.  *See Bricklayers Ins. & Welfare Fund v. J.K. Merillin Builders, Inc.*, No. 13-cv-1048 (ARR), 2014 WL 6674404, at *5 (E.D.N.Y. Oct. 6, 2014).

7

ERISA also requires the employer to maintain records with respect to each of its employees "sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1).  If an employer fails to keep records as ERISA requires, a modified summary judgment burden-shifting framework applies.  *See Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 20 (S.D.N.Y. 2019). Under this framework, the plaintiff may meet its burden by producing evidence that raises "genuine questions" about the accuracy of the employer's records.  *Id.* (quoting *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Eng'rs, Local 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utils. Inc.*, 3 F. Supp. 3d 204, 214 (S.D.N.Y. 2014)).  The burden then shifts to the employer to produce evidence showing the precise number of hours worked or negating the reasonableness of the plaintiff's evidence.  *Id.*

## I.   Liability

The Court finds no genuine dispute of material fact that Superior is liable to the plaintiffs under ERISA and the LMRA for failing to make payments as required by the parties' contracts.

### A.  Delinquency

The Court first must determine which contracts applied between the parties during the audit period.  It is undisputed

that Superior was a party to the NSA, a collective bargaining agreement effective during the entire audit period.  (Def.'s Counter-56.1 ¶¶ 12–16.)  It is also undisputed that the NSA in turn bound Superior to the terms of its CBAs with the Council and to the Funds' trust agreements.  (*Id.* ¶¶ 19–20, 32–36.) Finally, it is undisputed that the trust agreements incorporated the Funds' Collection Policy.  (*Id.* ¶¶ 37–40.)

Having established that the NSA, CBAs, trust agreements, and Collection Policy bound the parties during the audit period, the Court finds no genuine dispute that Superior breached these contracts during that period.  First, Superior failed to submit pre-job notifications or hold pre-job conferences as required by the NSA.  (*Id.* ¶¶ 21–23, 60–64.)  Second, Superior failed to report 10,748.5 hours of covered work performed by its employees during the audit period, resulting in a delinquency of fringe benefit contributions and dues checkoffs that Superior never paid.  (*Id.* ¶¶ 55–56, 59.)  Superior does not dispute that the relevant contractual provisions described above bound the parties during the audit period or that the plaintiffs conducted the audit, nor does it challenge the auditor's methodology. Rather, Superior raises defenses based on other provisions.

**B.   "Key" Employee Clause**

The plaintiffs anticipated that Superior would raise a defense based on the NSA's "key" employee clause.  (*See* ECF

9

No. 45, Mem. Law Supp. Pls.' Mot. Summ. J. ("Mem."), 14, 17–18.) That clause permitted Superior to bring a certain number of "technical employees" to a job, who had "complete mobility to move from one local jurisdiction to another." (*Id.* ¶ 90.) For these key employees, Superior would contribute only to the benefit funds designated by key employees as their "home trust funds." (*Id.* ¶ 91.) However, Superior was required to identify any key employees to LIUNA and also to state the number of key employees on the pre-job notice for any particular job to which they would be brought. (*Id.* ¶¶ 92–93.)

Superior apparently abandoned its key employee defense in its memorandum in opposition to summary judgment, which does not mention the key employee clause. (*See generally* ECF No. 37, Mem. Law Opp'n Pls.' Mot. Summ. J. ("Opp'n")). Regardless, Superior would not have prevailed on that defense. Superior produced no pre-job notices in response to the plaintiffs' discovery requests. (*See id.* ¶¶ 22–23, 60–64.) Thus, because Superior failed in its obligation under ERISA to keep adequate records with respect to key employees, the burden shifted to Superior to produce evidence showing why it was unreasonable for the plaintiffs to have designated no employee as a key employee in the audit. *See LJC*, 400 F. Supp. 3d at 20. Superior produced no evidence identifying any employee covered in the audit report as a key employee. (Def.'s Counter-56.1 ¶¶ 65–66.)

Thus, the key employee clause does not give rise to genuine issues of material fact that would preclude summary judgment.

### C.   Local 731

Superior's primary argument in opposition to summary judgment is that it met its contractual obligations by contributing to the benefit funds of Local 731, which Superior alleges also had jurisdiction over the relevant work.  (*See* Opp'n 11–12.)  Superior alleges that both the plaintiff Funds and Local 731's funds were parties to a LIUNA National Reciprocity Agreement ("NRA").  (Opp'n 7–8, 11.)  It is unclear precisely why Superior believes the NRA is significant, and Superior cites no specific provisions of that twenty-one-page document.  (*See id.*)  Superior appears to suggest that the NRA somehow permits it to offset its obligations to one LIUNA member union's funds by paying another member's funds.  (*See id.*)

Superior cannot prevail on this defense.  First, it offered no admissible evidence that the Council's funds or Local 731's funds actually were parties to the NRA during the audit period. The purported NRA is an undated and unsigned "Handbook," (*see* ECF No. 40-1, Scaraggi Decl. Ex. A), which is "not properly authenticated" and thus "may not be considered" in opposition to summary judgment, *see White Diamond Co., Ltd. v. Castco, Inc.*, 436 F. Supp. 2d 615, 624 (S.D.N.Y. 2006); *see also* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 901(a).  An "undated and

unsigned agreement" has "no evidentiary value and would be inadmissible at trial." *Lubrano v. Berkshire Life Ins. Co.*, No. 94-cv-5651 (ILG), 1995 WL 313144, at *4 (E.D.N.Y. May 17, 1995) (granting summary judgment and refusing to consider undated and unsigned contract that non-moving party argued created genuine dispute of material fact). Thus, the purported NRA creates no genuine dispute of material fact that would preclude summary judgment.

Moreover, there is no general legal principle permitting an employer to offset its delinquency to one union by paying another. The "fact that an employer may be required to make double payments with respect to two different funds under different collective bargaining agreements is not a defense [to an ERISA claim] and does not preclude recovery." *A.S.C. Contracting Corp. v. Local Union 175 Welfare Fund*, No. 08-cv-2504 (BMC), 2010 WL 11627432, at *4 (E.D.N.Y. May 14, 2010) (finding employer liable for contributions to two different unions' benefit funds for work performed by the same employees). As for Superior's argument that a "double payment . . . would impose an unfair and unjust hardship," (Opp'n 12), any double payment stems not "from an inequitable application of [ERISA], but rather from" the fact that Superior willingly incurred "obligations arising out of two separate collective bargaining agreements" with different unions, *see Trs. of the*

12

*Bricklayers & Allied Craftworkers, Local 5 N.Y. Ret., Welfare, Apprenticeship Training & Journeymen Upgrading & Lab.–Mgmt. Coalition Funds v. Plaster Master, Inc.*, No. 99-cv-5194 (BDP), 2001 WL 34456771, at *4 (S.D.N.Y. Jan. 9, 2001). Superior cites no authority for its suggestion that the Council's and Local 731's mutual affiliation with LIUNA somehow distinguishes this case from other cases where courts have imposed liability on an employer to multiple unions under separate collective bargaining agreements. (*See* Opp'n 7–8.) The Court finds no ground for such a distinction based on its review of the NSA.

### D.   Arbitration Clause

Finally, raising the issue for the first time in this litigation, Superior cites the NSA's arbitration clause and suggests it applies to the instant action. (*See id.* 4-6.) That clause does not preclude summary judgment. First, the Funds are not parties to the NSA; only LIUNA and Superior are. (*See* ECF No. 39-1, Angelone Decl. Ex. A, p. 13.) The NSA's arbitration clause applies only to "disputes or grievances involving or arising out of the interpretation or application of the provisions of" the NSA itself. (*Id.* Art. XVII(A).) Superior's obligations to contribute to the Funds and remit dues checkoffs arise from the CBAs and the Funds' trust agreements. (*See* Def.'s Counter-56.1 ¶¶ 27-36.) Thus, the Funds are not bound by the NSA's arbitration clause. *See Trs. of the Sheet Metal*

13

*Workers' Nat'l Pension Fund v. Steel & Duct Fabrication, Inc.*, 124 F. Supp. 3d 187, 194 (E.D.N.Y. 2015) (denying employer's demand to arbitrate claims by employee benefit funds who were not parties to the contract containing the arbitration clause).

Second, to the extent the arbitration clause may apply to the Council as a LIUNA affiliate, Superior has waived its right to arbitrate by "acting inconsistently with that right." *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022). A waiver is a "knowing and voluntary surrender of a contractual right," which can be explicit or implicit. *Deng v. Frequency Elecs., Inc.*, 640 F. Supp. 3d 255, 263–64 (E.D.N.Y. 2022). In the arbitration context, key indicators of an implicit waiver include the amount of time that passed from commencement of the action to invocation of the right and the amount of litigation that occurred during that time. *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 29 (E.D.N.Y. 2023).

The plaintiffs commenced the instant action against Superior on February 24, 2022. (ECF No. 1, Compl.) On April 15, 2022, they filed the operative Amended Complaint, which is based in large part on the NSA, the contract with the arbitration clause at issue. (*See* ECF No. 15, Am. Compl., ¶¶ 11–18, 23–25.) Superior never moved to dismiss or stay the case in favor of arbitration. Instead, it filed its Answer on April 28, 2022, asserting twelve affirmative defenses but none

14

based on the arbitration clause.  (*See* ECF No. 17, Answer to Am. Compl.)  Superior then engaged in discovery with the plaintiffs from May 2022 to August 2023, extending the deadline by consent six times without ever invoking its right to arbitrate.  (*See* ECF No. 19, May 31, 2022, Ltr. from J. Mele; Minute Entry, Sept. 13, 2022; Order, Nov. 21, 2022; Order, Jan. 24, 2023; Order, Mar. 3, 2023; Order, Apr. 3, 2023; Order, May 22, 2023; ECF No. 29, Aug. 4, 2023, Ltr. from D. Lyons & M. Scaraggi.)

When discovery closed, the plaintiffs sought a pre-motion conference in anticipation of moving for summary judgment.  (ECF No. 31, Sept. 18, 2023, Ltr. from D. Lyons.)  In response, Superior filed its own pre-motion letter and Rule 56.1 counterstatement forecasting its arguments in opposition to the plaintiffs' motion, and neither document mentioned the arbitration clause.  (*See* ECF No. 32, Def.'s Rule 56.1 Counterstatement; ECF No. 33, Oct. 19, 2023, Ltr. from M. Scaraggi.)  The Court held the requested pre-motion conference on November 9, 2023, where the parties discussed their positions on the merits of the Plaintiffs' anticipated motion and Superior still did not mention the arbitration clause.  (Minute Entry, Nov. 9, 2023.)  Finally, only after the plaintiffs served their motion on December 15, 2023 – twenty-three months after the plaintiffs commenced this action – Superior invoked the arbitration clause in its opposition

15

memorandum on January 16, 2024.  (*See* Opp'n 4-6.)  Superior

offers no explanation for the delay.  (*See id.*)

Superior's litigation conduct was inconsistent with a right

to arbitrate.  It sought arbitration after over a "year of

merits-based discovery that explored every conceivable aspect of

the ultimate issue to be decided."  *See Mason Tenders Dist.*

*Council of Greater N.Y. v. Gilbane Bldg. Co.*, No. 16-cv-7049

(CM), 2018 WL 4691659, at *1 (S.D.N.Y. Sept. 19, 2018); *see also*

*GateGuard, Inc. v. Goldenberg*, 585 F. Supp. 3d 391, 397

(S.D.N.Y. 2022) (finding twenty-two-month delay weighed in favor

of finding waiver).  This discovery involved issuing and

responding to interrogatories and document requests, resolving

alleged deficiencies in the responses, depositions, and

supplemental non-party discovery based on information revealed

in the depositions.  (*See* ECF No. 23, Nov. 18, 2022, Ltr. from

D. Lyons; ECF No. 27, Mar. 31, 2023, Ltr. from D. Lyons.)

After Superior litigated this case for so long and likely

incurred substantial costs in the process, its present

invocation of the arbitration clause tucked into its memorandum

opposing summary judgment on the merits "does not appear to be

an attempt to realize the advantages of arbitration," which

trades the rigor of the judicial process for speed and

efficiency.  *See Raymond v. Mid-Bronx Haulage Corp.*,

No. 15-cv-5803 (RJS), 2017 WL 5558760, at *4 (S.D.N.Y. May 24,

2017), *vacated on reconsideration on other grounds*, 2017 WL
9882601 (S.D.N.Y. June 10, 2017); *see also Wortham v. Total
Transp. Corp.*, No. 21-cv-85 (LDH) (MMH), 2024 WL 3387264, at *8
(E.D.N.Y. May 31, 2024) (finding waiver of right to arbitrate
where defendants did not invoke arbitration clause earlier "even
though it would have obviated the need for discovery and motion
practice during the first eleven months of the case").

Moreover, Superior cannot credibly claim that it did not
know of the arbitration clause until the plaintiffs served their
summary judgment motion.  *Compare Alvarez*, 661 F. Supp. 3d at 31
(finding no waiver where party seeking arbitration discovered
arbitration agreement midway through case and invoked it four
days later).  The NSA is not some obscure document but rather a
key contract in this case.  Superior was on notice of its
importance arguably since February 2022, when the plaintiffs
filed their original complaint, but at the very latest since
April 2022, when the plaintiffs filed the operative Amended
Complaint replete with explicit references to the NSA.  (*See* ECF
No. 15, Am. Compl. ¶¶ 11-18, 23-25.)  Accordingly, Superior
waived its right to arbitrate and may not rely on the NSA's
arbitration clause at the eleventh hour to avoid summary
judgment.

## II.  Remedies

Having established Superior's liability, the Court will

17

determine the remedies to which the plaintiffs are entitled.
ERISA permits an employee benefit plan that prevails in an
action for unpaid contributions to recover damages, interest,
statutory (or "liquidated") damages, attorney fees and
litigation costs, and any other appropriate relief.  29 U.S.C.
§ 1132(g)(2).  Courts may award damages at summary judgment
where, as here, the damages are "readily calculable based on the
undisputed facts."  *See AEP Energy Servs. Gas Holding Co. v.
Bank of Am., N.A.*, 626 F.3d 699, 740 (2d Cir. 2010).

    **A.   Damages**

    The Court finds no genuine dispute as to the plaintiffs'
damages.  The plaintiffs produced a comprehensive audit
identifying 10,748.5 hours of covered work performed by
Superior's employees during the audit period that Superior
failed to report.  (*See* ECF No. 44, Pls.' Am. Rule 56.1
Statement ("Pls.' 56.1"), ¶ 74.)  Based on these unreported
hours, the auditor found a delinquency of $257,210.35 in fringe
benefit contributions and $33,158.41 in dues checkoffs.  (*Id.*
¶¶ 75–76.)  Accounting for the Council's and Local 731's
participation in some common funds, the auditor deducted
Superior's contributions to those funds to arrive at a revised
total delinquency of $276,435.38, comprising $254,938.42 in
fringe benefit contributions and $21,496.96 in dues checkoffs.
(*Id.* ¶¶ 77–79.)  It is undisputed that Superior paid none of

this amount to the plaintiffs.  (Def.'s Counter-56.1 ¶ 80.)  The
auditor's declaration adequately explains its methods and
provides detailed calculations.  (*See* ECF No. 36, Bamberg Decl.)
Thus, the plaintiffs' evidence raises at least a "genuine
question" about Superior's failure to maintain accurate records.
*See LJC*, 400 F. Supp. 3d at 20 (quoting *Eastport*, 3 F. Supp. 3d
at 214).

The burden then shifted to Superior to produce evidence
suggesting an error in the plaintiffs' calculations.  *See id.* at
21.  Superior did not meet that burden.  Superior produced only
a copy of the NRA – which the Court already has found
inadmissible, (*supra* I.C) – Superior's letters purporting to
refute the amounts claimed, and purported records of payments to
Local 731's funds.  (*See* Def.'s Counter-56.1 ¶¶ 74-80.)  The
first letter merely states that Superior "do[es] not agree with
[the auditor's] findings and . . . dispute[s] all of their audit
results" but provides no evidence that the auditor's findings
were inaccurate.  (ECF No. 40-2, Scaraggi Decl. Ex. B.)  The
second letter reiterates that Superior "adamantly disagree[s]
with [the] audit findings," referencing Local 731 and the "key"
employee clause.  (*Id.*)  These letters' vague assertions fall
far short of the detail necessary to raise a genuine dispute as
to the accuracy of a properly conducted audit.  *See Gesualdi v.
RRZ Tucking Co., LLC*, No. 03-cv-3449 (ETB), 2011 WL 1988374, at

*5 (E.D.N.Y. May 20, 2011) (finding employer failed to carry summary judgment burden where it "failed to produce any evidence that raised a genuine question as to the accuracy of the audit").  As for the payments to Local 731's funds, (*see* ECF No 40-3, Scaraggi Decl. Ex. C), the Court already explained that these payments do not offset Superior's obligations to the plaintiff Funds, (*supra* I.C).

In sum, the plaintiffs supported their requested damages with a detailed audit report, which the Court credits.  In response, Superior "has failed to demonstrate that the amount of delinquent contributions calculated by the Funds is inaccurate." *Gesualdi*, 2011 WL 1988374, at *5 (granting summary judgment).  Thus, the plaintiffs are entitled to $276,435.38 in damages.

### B.   Pre-Judgment Interest

The plaintiffs are entitled to pre-judgment interest on the unpaid contributions in accordance with the rate provided under the CBAs.  29 U.S.C. § 1132(g)(2)(B).  The CBAs provide for interest on both ERISA contributions (*i.e.*, fringe benefit contributions) and non-ERISA contributions (*i.e.*, dues checkoffs) at a rate of eighteen percent per annum.  (*See* Pls.' 56.1 ¶ 81; *see* ECF Nos. 39-2 through 39-5, Angelone Decl. Exs. B–E, Art. XI, Sec. 11(f) (stating that Superior "shall be liable for the payment of [fringe benefit] contributions and dues check-offs with interest of eighteen percent (18%) per

annum" in the event of a delinquency).)[5]

The plaintiffs seek $206,093.90 in pre-judgment interest, reflecting daily interest calculated at a rate of eighteen percent per annum on each month's delinquency during the audit period, running for each month from the latest possible date under which interest could possibly start accruing under the CBAs' terms through December 15, 2023, the date on which the plaintiffs filed the instant motion.  (*See* Pl.'s 56.1 ¶¶ 81–82; ECF No. 41-9, Lyons Decl. Ex. I.)  Superior does not dispute the plaintiffs' method of calculating interest.  (*See* Def.'s Counter-56.1 ¶¶ 81–82.)  Accordingly, the plaintiffs are entitled to $206,093.90 in pre-judgment interest on the principal delinquency through December 15, 2023.  The plaintiffs will be awarded additional pre-judgment interest until the date the judgment is entered.  *See Cement & Concrete Workers Dist. Council Welfare Fund v. Manny P Concrete Co.*, No. 19-cv-2145 (WFK), 2023 WL 3948751, at *10 (E.D.N.Y. June 12, 2023) (noting that a plaintiff in an ERISA action is entitled to "interest on the principal delinquency from the date contributions were initially due until the date upon which [the] judgment is

---

[5] Superior "denies" the plaintiffs' facts regarding interest, statutory damages, audit fees, and attorney fees on the ground that the plaintiffs are not entitled to damages.  (*See* Def.'s Counter-56.1 ¶¶ 81–89.)  Because the Court already has found the plaintiffs entitled to damages and Superior did not dispute the plaintiffs' facts with respect to these further remedies on any other ground, the Court considers these facts undisputed.  *See* Fed. R. Civ. P. 56(e)(2) (explaining that the court may consider a party's factual assertion undisputed if the other party fails to address it).

entered"). The plaintiffs shall provide updated calculations for pre-judgment interest and a per-diem rate so that the Court may add the per diem rate as appropriate through the date the final judgment is entered.

### C. Statutory Damages

ERISA provides for statutory damages at the rate provided under the plan, not to exceed twenty percent of the unpaid contributions. 29 U.S.C. § 1132(g)(2)(C)(ii). The CBAs provide for statutory damages at a rate of twenty percent per annum. (*See* Pls.' 56.1 ¶ 83.) Superior does not dispute that this provision applies if the underlying damages are valid. (*See* Def.'s Counter-56.1 ¶ 83.) Accordingly, the plaintiffs are entitled to $55,287.08 in statutory damages.

### D. Attorney Fees and Costs

Though the plaintiffs are entitled to attorney fees, they have not stated the amount requested. (*See* Mem. 21.) Accordingly, the plaintiffs' request for attorney fees and costs is denied without prejudice. The plaintiffs are ordered to provide contemporaneous billing records documenting for each attorney the date, number of hours expended, the nature of the work, and the attorney's credentials. The plaintiffs must support both their requested hourly rates and the number of hours for which they request fees with citations to recently decided comparable cases (ideally ERISA cases resolved on

motions for summary judgment) from the Eastern District of New York.

### E.   Audit Fees

Courts "routinely" award audit fees in ERISA actions. *Ferrara v. CMR Contracting LLC*, 848 F. Supp. 2d 304, 313 (E.D.N.Y. 2012).  Additionally, the CBAs explicitly provide for "reasonable audit and accounting expenses."  (*See* Pls.' 56.1 ¶ 86.)  The Funds request $14,355.75 in audit fees in this action.  (Mem. 20–21.)  Though Superior has not specifically contested that figure, the Court finds it quite high.  *See, e.g.*, *Gesauldi v. Dan Yant Inc.*, 6 F. Supp. 3d 264, 275 (E.D.N.Y. 2014) (awarding $1,300 in audit fees); *Ferrara*, 848 F. Supp. 2d at 313 (awarding approximately $4,000); *RRZ*, 2011 WL 1988374, at *7 (awarding $5,567.50).  Moreover, the plaintiffs support their request only with "a single-page invoice that provides no explanation of how each . . . employee who participated in the audit spent his or her time." *LJC*, 400 F. Supp. 3d at 24; (*see* ECF No. 36-4, Bamberg Decl. Ex. D). This evidence is insufficient to support an audit fee award.

Accordingly, the plaintiffs' request for audit fees is denied without prejudice.  The plaintiffs are ordered to provide detailed, contemporaneous billing records from their auditor documenting for each auditor the date, hourly rate, number of hours expended, and nature of the work.  *See LJC*,

400 F. Supp. 3d at 24.  The plaintiffs must support their requested amount by citing comparable cases and comparing their requested amount to amounts awarded in those cases.

### F.   Post-Judgment Interest

Though the plaintiffs do not specifically request it, the Court notes that they are entitled to post-judgment interest at the federal statutory rate from the date judgment is entered until the date it is paid in full.  *See* 28 U.S.C. § 1961(a).

### Conclusion

For the reasons stated above, the Court grants the plaintiffs' motion for summary judgment with respect to liability, damages, pre-judgment interest, and statutory damages.  The Court denies the plaintiffs' motion without prejudice with respect to attorney fees, costs, and audit fees. The plaintiffs also are entitled to post-judgment interest at the federal statutory rate.

The plaintiffs shall file a supplemental memorandum by August 8, 2024, (1) justifying the reasonableness of their requested attorney fee and audit fee awards with citations to relevant case law and contemporaneous billing records and (2) providing a formula for the Court to calculate pre-judgment interest through the date the judgment is entered.  Superior may file a response by August 22, 2024.  Should the parties elect to settle rather than engage in this supplemental briefing, they

24

shall notify the Court of the settlement immediately.

The Clerk of Court is respectfully requested to refrain from preparing the judgment until the Court resolves the issues to be raised in the supplemental memoranda.


**So ordered.**

Dated:    July 25, 2024
          Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York